Argued and submitted on May 30, 2014, affirmed March 25, petition for review allowed July 9, 2015 (357 Or 550)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT DARNELL BOYD,
*Defendant-Appellant.*

Lane County Circuit Court
201026332; A151157

346 P3d 626

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Attorney-in-Charge, argued the cause for respondent. On the brief were Ellen F. Rosenblum,

Attorney General, Anna M. Joyce, Solicitor General, and Mary H. Williams, Deputy Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Defendant, who was convicted of murder, assigns error to the trial court's denial of his motion to suppress statements that he made both before and after his arrest. Defendant raises several arguments—in which he requests plain error review of an unpreserved argument that he received inadequate *Miranda* warnings—which we have considered and reject without written discussion. We write to discuss defendant's remaining contention that the trial court erred in denying his motion to suppress certain statements that he made after he had invoked his right to counsel, thus violating Article I, section 12, of the Oregon Constitution[1] and the Fifth Amendment to the United States Constitution.[2] The trial court concluded that defendant reinitiated communication with an officer at the jail. We affirm.

On review of a trial court's denial of a motion to suppress, we are bound by the trial court's findings of historical facts that are supported by evidence in the record. *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). If the trial court fails to make specific findings, we presume that the trial court found facts in a manner consistent with its ultimate conclusion. *Id.* We must decide whether the trial court correctly applied the law to those historical facts. *Id.* With that standard in mind, we turn to the facts.

Defendant was transported to the police station on suspicion of murdering his girlfriend. After arriving at the police station, Officer Conrad removed defendant's handcuffs and asked defendant to remove his boots, which had blood on them. Upon request, defendant removed his boots and jacket. Detective Martin came in and photographed defendant's hand, which was injured, and sought to swab defendant's hand injury. Defendant took the swab from Martin, swabbed the injury, but refused to give it back to Martin. When Martin requested that defendant return the swab,

---

[1] Article I, section 12, provides, "No person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself."

[2] The Fifth Amendment provides, in relevant part, "No person shall * * * be compelled in any criminal case to be a witness against himself[.]"

defendant replied, "You ain't getting my DNA without my attorney." Defendant further explained his refusal to give the swab back, stating that he did not trust the police and government, that he did not know why he was at the police station, and asked that the police not talk to him until he had a lawyer.

At that point, Detective Myers arrested defendant for homicide, effectively ending the interview. Defendant continued talking to the police while they processed his arrest, saying that the victim was not dead, but the officers and detectives did not ask him any further questions while he was being processed. Those interactions occurred around 4:00 a.m.

Approximately seven hours later, Sergeant Lewis went to defendant's cell, after learning that defendant had been erroneously placed by other jail staff in a cell with a toilet and running water. Concerned about the potential destruction of evidence, Lewis asked defendant to show him the fronts and backs of his hands to determine whether defendant had washed the blood off his hands. Defendant complied. At the motion to suppress hearing, Lewis testified about his exchange with defendant:

"[LEWIS:]  So, I asked him to show me the fronts and backs of his hands.

"* * * * *

"[LEWIS:]  I asked him to stand up and show me his hands.

"[PROSECUTOR:]  And he does that?

"[LEWIS:]  Yes.

"[PROSECUTOR:]  All right. So, he shows you his hands and then what?

"[LEWIS:]  That was it. He showed me the hands and palms and I started to leave and he said to me, 'is anybody going to tell me why I'm here, I need to call my baby girl because she's going to wonder where I'm at?'

"[PROSECUTOR:]  Okay and then what?

"[LEWIS:]    I asked him if he didn't remember Detective Myers telling him why he was here, and he replied, 'no, I don't remember nothing about that or talking to nobody.'

"[PROSECUTOR:]    Then what?

"[LEWIS:]    I asked him, when he was talking about his baby girl, if he was referring to [the victim] *** and he said that it was, and then I just told him that I was present when Detective Myers told him that she was dead and he was under arrest for killing her, and he got real agitated and started breathing heavy [*sic*] and clenching his fists and told me, 'no, no, she ain't dead, you're lying' and then he tells me 'I want to talk to the detective that you said I talked to.'"

Lewis and Myers returned to the cell, where Myers talked with defendant, again read him his *Miranda* rights, and defendant said that he understood his rights. Defendant stated that he no longer wanted an attorney and wanted to talk to Myers. Defendant then made incriminating statements to Myers.

At the suppression hearing, defendant argued, as relevant here, that the officers circumvented or coerced him into making additional statements after he invoked his right to counsel. Later, at trial, defendant would argue that he was mentally impaired. The officers who testified each stated that they saw no evidence that defendant's mental capabilities were impaired, aside from a faint odor of alcohol on defendant's breath and the fact that he repeatedly asked questions about the victim. The officers testified that they did not observe defendant slur his speech or show other indicia of intoxication. Defendant understood and followed the officers' directions when he was initially approached in the field and later at the police station.

The trial court found as follows:

"With regard to [defendant]'s statement that he wanted Counsel, that the interview stopped, all questioning stopped of [defendant] at that point. It was only upon [defendant]'s request to have further contact with Detective Myers the questioning then began again, but only after having *Miranda* again read to [defendant], and having a voluntary waiver of his *Miranda* rights.

"There was no coercion. There were no threats made. There were no promises made. The Court finds that the statements in the—what's been considered the second interview in the holding cell—also are admissible based upon voluntariness and a knowing waiver of *Miranda*."

On appeal, defendant argues that Lewis reinitiated the interrogation when he asked defendant follow-up questions in response to defendant's questions. The state responds that Lewis's questions were not a reinitiation of the interrogation; rather, defendant's questions and statements to Lewis constituted the reinitiation of interrogation.

When a defendant "'has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.'" *State v. Kell*, 303 Or 89, 96, 734 P2d 334 (1987) (quoting *Edwards v. Arizona*, 451 US 477, 484, 101 S Ct 1880, 68 L Ed 2d 378 (1981)). When a defendant invokes the right to counsel, police must cease all interrogation until an attorney is provided, unless the defendant "initiates further communication, exchanges, or conversations with the police." *Id.*

To "initiate[] further communication, exchanges, or conversations with the police," a defendant must ask a question that "represent[s] a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 US 1039, 1045, 103 S Ct 2830, 77 L Ed 2d 405 (1983) (holding that communication was initiated by the question, "Well, what is going to happen to me now?"). However, certain questions do not reinitiate communications, such as "a request for a drink of water or a request to use a telephone" because those questions "are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* An officer's statement or question initiates a conversation with the defendant if his or her statement constitutes "words or actions on the part of police, other than those normally attendant on arrest and

custody, that the police should know are reasonably likely to solicit an incriminating response from the suspect." *State v. Barmon*, 67 Or App 369, 376-77, 679 P2d 888, *rev den*, 297 Or 227 (1984) (quoting *State v. Fitzgerald*, 60 Or App 466, 471, 653 P2d 1289 (1982)).

Here, the exchange at issue began when Lewis entered defendant's cell and asked defendant to show the fronts and backs of his hands. That statement constituted a question "normally attendant on arrest and custody" that is not a reinitiation of interrogation. *Fitzgerald*, 60 Or App at 471 (citing *Rhode Island v. Innis*, 446 US 291, 301, 100 S Ct 1682, 64 L Ed 2d 297 (1980)). Neither can defendant's further questions about why he was in custody and reference to his "baby girl" be characterized as reinitiation of interrogation, because those questions did not evince defendant's "desire for a generalized discussion about the investigation." *Bradshaw*, 462 US at 1046. That leaves Lewis's follow-up questions of whether, by asking about his "baby girl," defendant was referring to the victim and whether defendant remembered having a conversation with Myers. Defendant asserts that Lewis's follow-up questions constituted interrogation because they were likely to elicit evidence of defendant's mental state, which defendant later made a key issue at trial. The state contends that those questions were not interrogation, but, instead, were a generalized response to defendant's questions and not an attempt to elicit incriminating information from defendant. We agree with the state. As a general matter, neither was a question normally attendant to custody. However, neither were those questions the type of express questions that the police should know are reasonably likely to elicit an incriminating response from defendant. *Cf. Barmon*, 67 Or App at 376-77 (concluding that the following statement by an officer was reasonably likely to solicit an incriminating statement from the defendant: "Harry, I'd like to help you if I can, but I've got to get your side of the story before I do."). In response to defendant's more specific argument, the noninterrogational nature of Lewis's responses—in the form of follow-up questions intended to make clear to whom defendant was referring—did not change because defendant later claimed that he lacked the mental state to commit the crime.

Moreover, Lewis did not open the door in an attempt to elicit further information by asking any other questions or making any other statements that were likely to elicit an incriminating response from defendant. Defendant, however, did just that when, immediately after Lewis's clarifying question, defendant stated that Lewis was lying and requested to speak to Myers, indicating his "desire for a generalized discussion about the investigation." *Bradshaw*, 462 US at 1046.

If, as here, a defendant reinitiates interrogation, the next inquiry is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* "[T]his determination depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* at 1045-46 (citations, brackets, and quotation marks omitted).

After Lewis returned with Myers to defendant's cell, Myers read defendant his *Miranda* rights again. Defendant stated that he understood his rights but that he no longer wanted an attorney, opting instead to speak with Myers about what had happened. Approximately seven hours had passed since defendant's invocation of his right to counsel and subsequent arrest. At the suppression hearing, the officers testified that they saw no evidence of defendant's mental impairment. The trial court determined that defendant knowingly and voluntarily waived his *Miranda* rights. Under those circumstances, the trial court did not err in that conclusion.

In sum, the exchange leading up to defendant's request to speak to Myers was not a reinitiation of interrogation by either Lewis or defendant. *Bradshaw*, 462 US at 1045-46. However, defendant's request to speak to Myers evinced defendant's desire to have a discussion about the investigation. *Id.* Upon Myers's return to defendant's cell, defendant voluntarily and knowingly waived his *Miranda*

rights. *Id.* The trial court did not err in denying defendant's suppression motion.

Affirmed.